```
                                    UNITED STATES DISTRICT COURT
                                    SOUTHERN DISTRICT OF FLORIDA

                                    CASE NO.  07-14329-Civ-MOORE
                                    MAGISTRATE P. A. WHITE

DAVID J. BELL, JR.,           :

       Plaintiff,             :

v.                            :     REPORT OF
                                    MAGISTRATE JUDGE
DR. HARIDAS BHADJA,           :

       Defendant.             :
_____
```

## I. INTRODUCTION

In October 2007, plaintiff David J. Bell, Jr., a state prisoner at Okeechobee C.I. ("OCI"), filed a *pro se* civil rights complaint pursuant to 42 U.S.C. §1983, alleging that the OCI Medical Director, Dr. Haridas Bhadja, was deliberately indifferent to his serious medical needs in two ways.  First, Bell claims that Dr. Bhadja showed deliberate indifference by failing to provide prompt care for a broken ankle, which Bell sustained playing basketball on July 1, 2005, thereby allegedly impeding Bell's access to medical care, and causing delay of surgery to repair his injury. [The record shows that after Bell was taken to the hospital, he was not again housed at OCI until months later, in 2005]. Bell's second claim is that after his return to OCI, despite the fact that he was in pain, Dr. Bhadja did not provide him support devices that he needed to stand and walk. **This Cause is before the Court upon Dr. Bhadja's Motion for Summary Judgment (DE#36),** with exhibits consisting of the Affidavit of Dr. Michael S. Zeide, M.D. (DE#37-2), and copies of medical records pertaining to inmate/plaintiff Bell (DE#s 37-3, 37-4, and 37-5), as to which the plaintiff was advised of his right to respond (Order of Instructions, DE#38).[1] In opposition to the defendant's motion,

---

[1]  Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that

Bell filed a Response (DE#44), a Memorandum (DE#45), and his own Affidavit (DE#43). Defendant Bhadja filed no reply.

## II. THE PLAINTIFF'S ALLEGATIONS

Bell's allegations, as reflected in his complaint (DE#1) and summarized in the Preliminary Report (DE#6), were essentially as

---

summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir.1987), an Order of Instruction (DE#38) was entered, informing the *pro se* plaintiff Bell of his right to respond to the defendant's motion for summary judgment, and instructing him regarding the requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

follow. On July 1, 2005, Bell hurt his leg and ankle while playing basketball.  At the OCI infirmary, medical personnel [a nurse] telephoned Dr. Bhadja [the medical director] at home, to inform him that Bell was badly injured and that bone was protruding through his skin. According to Bell, Dr. Bhadja told the nurse to keep him in the infirmary until he [Bhadja] was scheduled to return to work on the following Monday, July 4, and not to take him to a hospital. According to Bell, the medical personnel kept him in the infirmary and gave him pain medication. Bell alleges that on July 3, 2005, Officer Butler came into the infirmary, saw that he was severely injured, and so informed the warden, who ordered that he immediately be taken to a hospital. According to Bell he then was transferred to SFRC to await surgery. Bell asserted that he had surgery on July 7, 2005, and upon his release he remained in a wheelchair for four months at SFRC. After his return to OCI, Dr. Bhadja initially provided a leg/ankle brace that had been recommended by a doctor at Larkin Hospital, but later, after that brace was confiscated by "institutional security," Dr. Bhadja "refused to provide [reissue] medical shoes with leg/ankle brace that is necessary to enable plaintiff to walk without substantial difficulty and discomfort." In his complaint, which was dated 10/20/07, Bell claimed that over a period of two years Dr. Bhadja "continued to refuse medical shoes included [sic] another leg/ankle brace" after the first brace was taken. (DE#1, p.7, ¶9). Bell resorted to use of the inmate grievance procedure. He states that he was "summoned to medical department by the defendant Dr. Bhadja as a result of plaintiff filing a grievance and advised by the defendant that he would not receive another 'brace' and that medical shoes were unnecessary to cope with his physical impairment." (Id., at p.7, ¶10).

### III.  DISCUSSION

#### A. The Law Concerning Medical Claims In the Prison Context

Title 42 U.S.C., Section 1983, requires an affirmative causal connection between an official's acts and an alleged constitutional deprivation. Harris v. Ostrout, 65 F.3d 912, 917 (11 Cir. 1995); Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11 Cir. 1995).

3

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. See Estelle, supra, at 104-06. Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11 Cir. 2003) (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11 Cir. 1994)).

The standard may be met where there is a showing that jail officials denied or delayed an inmate from receiving necessary medical treatment for non-medical reasons, see Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11 Cir. 1985). In addition, officials' inordinate delay in providing necessary treatment, without medical explanation, may evidence deliberate indifference, Farrow v. West, 320 F.3d 1235, 1247 (11 Cir. 2003), and the standard may be met where there is intentional, unexplained delay in providing to access treatment for serious painful injuries, Brown v. Hughes, 894 F.2d 1533 (11 Cir. 1990), and cases cited therein.

In Estelle, the Supreme Court reasoned that "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Id., 429 U.S. at 103. Not every claim by a prisoner, asserting that he has not received adequate medical treatment, however, is sufficient to state a violation of the Eighth Amendment. McElligot v. Foley, 182 F.3d 1248, 1254 (11 Cir.1999). Negligence is not enough,[2] and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment does not

---

[2] It is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. Estelle, supra, 429 U.S. at 104-06; Daniels v. Williams, 474 U.S. 327 (1986); Brown v. Hughes, 894 F.2d 1533, 1537-38 (11 Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11 Cir. 1988).

4

rise to the level of a constitutional deprivation.[3] Thus, it is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. Estelle, supra; Adams v. Poag, 61 F.3d 1538 (11 Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. Hamm v. DeKalb County, 774 F.2d 1567, (11 Cir.), cert. denied, 475 U.S. 1096 (1986).

Treatment violates the Eighth Amendment only if it involves "something more than a medical judgment call, an accident, or an inadvertent failure," Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5 Cir. 1980). It must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris v. Thigpen, 941 F.2d 1495, 1505 (11 Cir. 1991). In order to show an objectively serious deprivation of medical care, the inmate must demonstrate: 1) an objectively serious medical need that, left unattended, poses a serious risk of harm; 2) that the response made by public officials to that need was poor enough to constitute an "unnecessary and wanton infliction of pain," and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law; and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, *and that they*

---

[3]   Courts have long recognized that a difference of opinion between an inmate and the prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. Estelle, supra, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim). See: Ledoux v. Davies, 961 F.2d 1536 (10 Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); Ramos v. Lamm, 639 F.2d 559, 575 (10 Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. denied, 450 U.S. 1041 (1981); Smart v. Villar, 547 F.2d 112, 114 (10 Cir. 1976) (same); Burns v. Head Jailor of LaSalle County Jail, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

*actually did draw that inference*. Taylor v. Adams, 221 F.3d 1254, 1258 (11 Cir. 2002). The deliberate indifference requirement is discussed further, below.

### The Eighth Amendment

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)); Campbell v. Sikes, 169 F.3d 1353, 1362 (11 Cir. 1999); see also Whitley v. Albers, 475 U.S. 312, 327 (1986) (holding that "the Due Process Clause affords ... no greater protection").

In LaMarca v. Turner, 995 F.2d 1526, 1535 (11 Cir. 1993) the Court held that to prevail on an Eighth Amendment claim for damages in a civil rights suit, a plaintiff must prove three elements: 1) *an objective element*, a condition that inflicted unnecessary pain or suffering, Id., citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981); 2) *a subjective element*, deliberate indifference on the part of the defendant(s) to that condition, Id., citing Wilson v. Seiter, 501 U.S. 594 (1991); and 3) causation, Id., citing Williams v. Bennett, 689 F.2d 1370, 1389-90 (11 Cir. 1982). Both the objective and subjective elements must be satisfied. LaMarca, supra, 995 F.2d at 1535, n. 17 (citing Hudson v. McMillian, ___ U.S. ___, 112 S.Ct. 995, 999-1000 (1992)).

Although the Constitution does not require comfortable prisons, it does not permit inhumane ones. Farmer, supra, 511 U.S. at 832 (quoting Rhodes, supra, 452 U.S. at 349). Still, the Eighth Amendment does not authorize judicial reconsideration of "every governmental action affecting the interests or well-being of a prisoner," Whitley, 475 U.S. at 319; instead, "'[a]fter incarceration, only the "'unnecessary and wanton infliction of pain'"... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" Id. at 319 (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976) (citations omitted))). Crucial to establishing an "unnecessary and wanton infliction of pain" is some proof that officials acted with

specific intent. The exact nature of the specific intent required depends on the type of claim at issue. Campbell v. Sikes, supra, 169 F.3d at 1363. This specific-intent requirement for an Eighth Amendment violation applies to claims of medical indifference. Campbell v. Sikes, supra, 169 F.3d at 1363-64.

As the Eleventh Circuit in Campbell v. Sikes observed, the Supreme Court in Wilson v. Seiter, and later Farmer v. Brennan, has "refined the inquiry" regarding satisfaction of the subjective element required for an Eighth Amendment deprivation. Campbell, supra, 169 F.3d at 1363. The Supreme Court explained in Wilson v. Seiter, that the Eighth Amendment applies only to punishments, and that prison conditions are only punishment if a mental element of punitive intent is shown, Wilson, supra, 501 U.S. at 300 ("If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify"). In Farmer v. Brennan, the Court provided further explanation of the mental state that is required for deliberate indifference, Farmer, supra, 511 U.S. at 837-38 (holding that a prison official cannot be found liable under the 8th Amendment for denying an inmate humane conditions unless he knows of and disregards an excessive risk to inmate health or safety; and he must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant must also draw the inference).

As the Eleventh Circuit has noted post-Farmer, proof that the defendant should have perceived the risk, but did not, is insufficient. Campbell supra, at 1364 (citing Farmer, at 838); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11 Cir. 1996) (the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting Farmer, supra, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." Campbell, supra, at

7

1364 (citing Farmer, at 837).

### B. <u>Analysis</u>

#### 1. <u>Alleged Delay of Initial Care</u>

As noted <u>supra</u>, plaintiff Bell alleged in his complaint that after he broke his ankle on Friday, July 1, 2005, he was taken to the OCI infirmary. Medical staff [a nurse] called Dr. Bhadja at home, and informed him of the nature of the injury, including that the "bone began to surface through the skin." Bell claims that Dr. Bhadja told the "medical staff to keep the plaintiff station within the institutional infirmary until he arrived three days later on July 4, 2005." In his Affidavit (DE#43) Bell states that the nurse was E. Seczawa, R.N., and claims that her conversation with Dr. Bhadja was on a "walk around phone." Bell claims that he could clearly hear not only the nurse, but what Dr. Bhadja was saying. According to Bell, Bhadja said that "doctors are not at the hospital on weekends, just keep him there until Monday so I can take a look at it." Bell claims that over the nurse's objections, Dr. Bhadja insisted that he not be taken to the hospital.

The record (including medical documents at DE#s 37-3 and 37-4, and Dr. Zeide's Affidavit at DE# 37-2) belies plaintiff Bell's claim that with respect to the claim of delayed medical care, Dr. Bhadja was deliberately indifferent to his serious medical needs.

The record shows that at 20:15 (8:15 p.m.) on Friday, July 1, a fracture assessment was commenced at the OCI Infirmary (DE#37-3, p.1). The Nurse, E. Seczawa, R.N., noted plaintiff's symptoms on the form. In an attached page, captioned "Additional Comments," the nurse wrote on 7/1/05 at 2200 hours [10:00 p.m.] that Dr. Bhaja was notified of the inmate's condition, and that "Per Orders I/M placed in infirmary for observation to be sent for x-ray in AM." (DE#37-3, p.2). Thus, by 10:00 p.m. on the night of the injury, Dr. Bhadja had been consulted, and ordered that in the morning inmate Bell be taken to the hospital for x-rays. In addition, the record contains a Physician's Order Sheet dated 7/1/05 at 20:30 [10:30 p.m.], indicating that upon Dr. Bhadja's Orders, Bell was prescribed an IM

[intramuscular] injection of Demerol at 22:00, with another IM Demerol shot at 24:00 [midnight], and oral Motrin 800 mg three times a day, for three days, for pain. (DE#37-3, p.3). The record also contains a Physician's Order Sheet reflecting that on the morning of 7/2, at 9:10 a.m., a nurse [S. Vidal] acted upon Dr. Bhadja's order of the previous night that Bell be taken to the hospital. That Order sheet reads: "Inmate to Raulerson Hosp for X-rays and emergency room assessment via ambulance." (Id.). The medical record also clearly indicates that between the time that Nurse Seczawa spoke with Dr. Bhadja at about 10:00 p.m. on Friday [7/1], and Saturday morning [7/2] when Bell was taken to the hospital pursuant to Dr. Bhadja's orders, Bell's medical condition was not ignored.[4] The records, including plaintiff's medical documents of record, and Dr. Zeide's Affidavit, show that x-rays were obtained at Raulerson Hospital on July 2, 2005, and from Raulerson Hospital

---

[4] He was given a physical assessment by the time of the Friday night call to Dr. Bhadja [10:00 p.m.]. The Fracture Assessment form indicated that Bell had a possible broken ankle, with discoloration at the injury site, but that the bone was not protruding through the skin, and he had good blood flow in the leg. The nurse's notes read: "[with] bony protrusion to R [right] inner ankle, able to feel thin hard ridge under skin, foot pointing outward, I/M [inmate] unable to move foot, pedal and heel & pop pulses present & strong, skin W&D [warm & dry], cap[illary] refill immediate, nails pink, dark blotchish skin areas near possible fx [fracture] site...". (DE#37-3, p.2). The Friday 10:00 p.m. entry further indicates that an ace wrap was applied above and below the site, that the foot of the bed was elevated and pillows were placed under the right lower extremity, and Bell was instructed to report any increase in pain, or numbness to the nurse. He was told that the leg was being kept elevated to improve circulation, and reduce edema (swelling). (Id.).

The 3:30 a.m. chart entry on Saturday, 7/2/05, indicated that Bell's pulses remained strong, his color was WNL [within normal limits], his nails were pink, and the skin was W&D. It also indicates that Bell was given Motrin, that he removed the ace wrap -- stating that he felt better without it, and that he continued to refuse ice packs. (DE#37-3, p.5). The chart entry at 8:00 a.m., indicated that Bell continued to complain of pain, and requested to speak with the OIC [Officer in Charge]. His vital signs were taken, and were normal. His foot and ankle remained elevated on pillows. The nurse noted that there was deformity with the foot turned to the right, there was edema around the apparent fracture site, the foot was warm to the touch. Bell's pulse was checked, and he stated that he could not move his foot or toes, but he was able to raise his leg with discomfort.(Id., at p.5).

A 10:15 a.m. chart entry on Saturday, 7/2/05, indicates that "Per MD [doctor's] orders IM [inmate] sent to Raulerson Hosp for ER eval and X-rays. Demerol 25 mg IM [intramuscular] given for discomfort. To Raulerson @ 10:15 via all County Ambulance." (Id., at p.5).

Bell was transferred to SFRC [South Florida Reception Center] to await surgery, which was scheduled to be done at Larkin Hospital.

As demonstrated by the record, and noted in Dr. Zeide's Affidavit, after Bell's Saturday morning transfer to Raulerson Hospital, he was no longer under the care of Dr. Bhadja, who was not the Medical Director at SFRC, [and was not a practicing physician at Raulerson or Larkin Hospitals]. Bhadja, therefore cannot be responsible for any delay or alleged deficiency in care of inmate Bell after he left OCI at about 10:00 a.m. on Saturday 7/2 to receive x-rays and hospital care ordered the night before.[5]

The record does not suggest deliberate indifference on the part of the defendant, Dr. Bhadja, between the Friday night phone call and plaintiffs' transfer to the hospital on Saturday morning.

Dr. Bhaja having been informed of plaintiff's condition, symptoms, made a medical decision that rather than having plaintiff Bell taken to the Raulerson Hospital ER in the middle of the night, it was appropriate to transfer him there for examination and x-rays in the morning. In doing so, however, Dr. Bhadja did not simply ignore the plaintiff's condition and discomfort. He determined the recommended course of action based on the nurse's first hand examination of Bell's ankle, leg, and his overall physical condition. Pursuant to Dr. Bhadja's Orders, Bell was immediately given shots containing strong pain medication, and additional oral medication for pain. Additional steps were taken to reduce/control Bell's pain, maintain good circulation, and reduce swelling of the injured extremity throughout the night, until he was transferred to the Hospital for x-rays and evaluation.

---

[5] In his Affidavit (DE#37-2), Dr. Zeide, who is a Clinical Professor of Orthopedics at the University of Miami School of Medicine, familiar with ankle fractures, opines that it was medically reasonable for Dr. Bhadja to hold Bell at the infirmary prior to transfer to Raulerson Hospital, that it was reasonable for Bell to be held at SFRC prior to his transfer to Larkin Hospital for surgery, and it was more than reasonable for Bell to receive surgery within one week of sustaining the injury. Dr. Zeide further opines that the medical record does not document that the alleged delay in surgery hampered Bell's recovery or resulted in permanent injury or disfigurement.

Apart from a possible argument that his x-ray might have been taken sooner, if Bell had been transported to the ER at 10:00 a.m. on Friday night, rather than Saturday morning, there is nothing to suggest that care provided to Bell at the jail was different than that which would have been provided at the hospital while waiting for an X-ray. Nor is there any suggestion that Bell's surgery would have been performed any sooner, if Dr. Bhadja had ordered that Bell be taken to the hospital immediately on the night of Friday, July 1, and the x-ray had been taken on Friday rather than Saturday. [Even when he was taken to the hospital on Saturday, July 2, shortly after 10:00 a.m., and was seen by hospital staff, his surgery still was not scheduled to be performed until 5 days later, on Thursday, July 7].

As discussed in detail, above, the fact remains that Bell's condition was not ignored by Dr. Bhadja or by staff under his supervision. It cannot be said that with regard to the claim of delayed provision of medical care, that Dr. Bhadja was deliberately indifferent. As noted supra (Section "III.A." of this Report) to prevail on a medical claim under the Eighth Amendment for cruel and unusual punishment, plaintiff Bell must establish not only that there was an excessive risk to his health or safety, but that from the facts of which the defendant was aware it could be inferred that a substantial risk of serious harm existed if he was not transported immediately to the hospital; and finally, Bell must establish that the defendant drew that inference and yet failed to act.  Bell has not done so; the required subjective element for an Eighth Amendment deprivation is therefore not satisfied; and the defendant Bhadja is therefore entitled to summary disposition of the claim in his favor.

### 2. Alleged Denial of Support Devices After Plaintiff's Return to OCI

There remains plaintiff's claim that Dr. Bhadja failed to provide him with a second/replacement leg/ankle brace, which plaintiff alleges he needed in order to be able to walk without substantial difficulty and discomfort.

11

The defendant, by incorporating Dr. Zeide's Affidavit, argues that the medical record before the Court does not reflect that plaintiff Bell was unable to walk without pain and difficulty if he did not have the second/replacement brace.

On first glance, construing the plaintiff's complaint, and the defendant's evidence of record in the light most favorable to the non-movant/plaintiff for purposes of the summary judgment motion now before the Court, it would appear that there remain issues of material fact in dispute, the existence of which would foreclose summary disposition of the claim on the merits. This is because it is plaintiff Bell's claim that between an unspecified date after his late-2005 return to OCI from SFRC, and the date of his October 2007 complaint, he needed but was denied the second [replacement] ankle brace. While the date on which first brace was confiscated is not alleged, and cannot be determined from the record, the plaintiff indicates under penalty of perjury in his Affidavit opposing the defendant's Motion (DE#43), that his requests for a replacement brace were ignored over a period of nearly two years prior to the filing of his October 2007 §1983 Complaint. The defendant's exhibits do not contain evidence concerning plaintiff's medical needs beyond late December 2005, or January 2006.[6]

---

[6] In his summary judgment motion (DE#36) Bhadja frames the plaintiff's claims, stating "Bell alleges that Dr. Bhadja delayed him emergency medical care and <u>failed to provide a second leg/ankle brace or other medical shoes</u>." (DE#36, p.1). In his Motion DE#36 Bhadja incorporates, by reference, his supporting Memorandum (DE#37) and the Affidavit of Dr. Michael Zeide (DE#37-2), and pertinent aspects of Bell's medical records. In his supporting Memorandum (DE#37), when summarizing facts relating to events that occurred and the care given to plaintiff Bell, Bhadja makes no reference to ankle braces or shoes (<u>see</u> "Statement of Facts" at DE#37, pp.2-4). In the section "IV.B.1" of Bhadja's Memorandum, captioned "Dr. Bhadja's Care," there is reference only to the initial alleged delay of care from July 1 to July 2, and no mention of ankle braces or shoes. (<u>See</u> DE#37 at pp.9-10). In Dr. Zeide's Affidavit, which the defendant has incorporated by reference into his Summary Judgment, however, the affiant [Zeide] states "The medical record does not document that Mr. Bell was unable to walk without substantial pain or difficulty due to the fact that he did not receive a second leg/ankle brace or other medical shoes." (Affidavit, DE#37-2 at pp.3-4, ¶I).

It is apparent that the gravamen of plaintiff's claim about a leg/ankle brace is that, despite multiple requests to Dr. Bhadja, he was not issued a second brace after his first one was confiscated. Dr. Bhadja states that the plaintiff returned to OCI from SFRC on 9/27/05 (Memorandum DE#37, "Statement of Facts" at p.3) (citing page 55 of the medical record, which is located in the

Closer inspection of the plaintiff's own Affidavit (DE#43), when read in conjunction with his complaint, shows that even if there were one or more issues of material fact in dispute, the plaintiff cannot prevail in this case on the claim regarding the ankle brace. This is because the defendant, in addition to arguing that plaintiff cannot prevail on the merits, has raised a separate defense in his motion (Memo, DE#37, at p.6). There, defendant argues that the DOC Record (Medical Record, pp.1-68) "is void of any grievances filed by Bell with respect to...failing to provide Bell with a second leg/ankle brace or other medical shoes." (DE#37, p.6). The defendant further argues that "[a]s such, Bell never appealed a denial of a grievance to the Secretary of the Florida Department of Corrections as required under the Florida Administrative Code and PLRA." (Id.).

---

record at page 5 of DE#37-5). If Bell was indeed transferred from SFRC to OCI on 9/27/05, it would appear that he did not remain at OCI continuously thereafter, because the record includes other documents indicating that Bell arrived at OCI from SFRC on 11/8/05. The medical record establishes that on 11/11/05, just 3 days after Bell's November 2005 arrival at OCI, Bell was referred "for [a] cane [and a] no prolong[ed] standing [pass]. (DE#37-5, at p. 10, Nurse's 11/11/05 Chart entry at 15:00 [3:00 p.m.]). The record shows that Bell was examined and evaluated shortly thereafter, and that pain medication, and an ankle support and walking cane were prescribed (see DE#37-5, at p.10, Chart Entry dated 11/11/05 below which is a stamp bearing Dr. Bhadja's name; see also DE#37-5 at p.6, Physician's order Sheet, dated 11/11/05 at 15:30 [3:30 p.m.], for pain medication and a right ankle support). The record further shows that a cane and ankle brace were issued on 11/15/05. (DE#37-5 at p.11, Chart entry dated 11/15/05 at 15:40 [3:40 p.m.]). The Chart for Bell's visit at the 11/30/05 OCI Chronic Illness Clinic indicates that he was thoroughly examined, and was to "continue Brace & Motrin & Cane" and was to keep his right leg up ("elevate R L.E. [lower extremity]." (DE#37-5, p.12). A chart entry at 10:45 a.m. on 12/28/05 indicates that Bell was seen by a physician's assistant, and that his care plan included "elastic Brace." (DE#37-5, p.13). A Consultation Request issued by the same Physician's Assistant on 12/28/05 noted that inmate Bell was "now presenting [with] pain, edema, & unsteady gate [with] cane." The Consultation Request sought: "Recomment [sic] Treatment." (Id.). On 12/29 at 10:09 a.m. the Consultation Request was faxed for approval (Chart entry, at DE#37-5, p.17); on 1/3/06 the appointment for Orthopedic Evaluation was scheduled for 1/11/06 (Id.). The Consultant's Report, dated 1/11/06 listed Findings: "Doing well ambulate," and "Minim[um] swelling [with] full ROM [range of motion]." The Recommendations made by the Orthopedic consultant after his exam were: "D/C [discontinue] cane; and issuance of a 3 month pass for "no prolonged ambulation;" and that Bell "return f/u prn" [i.e. return for follow up when ever necessary]. (DE#37-5, p.15). There was no mention of the ankle brace in the Orthopedist's Report. On 1/17/05 the Orthopedist's recommendations were entered on Bell's medical chart (DE#37-5, Chart entry bearing Dr. Bhadja's stamp). The last entries in Bell's "Chronological Record of Health Care" where nurses' and doctors' notations are charted, are for the dates 1/27/06, 1/31/06, and 2/8/06, none of which reference his ankle brace (DE#37-5, p.18).

13

The PLRA (Prison Litigation Reform Act of 1995) contains a pre-suit exhaustion requirement, requiring that prisoners exhaust their available administrative remedies before bringing a suit for damages in federal Court. The exhaustion provision, which is codified at 42 U.S.C. §1997e(a), as amended, reads as follows:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The Courts have made clear that §1997e(a), as amended, now requires a prisoner to have exhausted those administrative processes which are available to him <u>before</u> bringing suit on a claim in federal court. <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1325-26 (11 Cir. 1998); <u>Booth v. Churner</u>, 532 U.S. 731, 736-41 (2001) (holding that "one 'exhausts' processes, not forms of relief..."); <u>Miller v. Tanner</u>, 196 F.3d 1190, 1193 (11 Cir. 1999) (incarcerated state prisoner must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under §1983); <u>Harper v. Jenkin</u>, 179 F.3d 1311, 1312 (11 Cir. 1999) (where a grievance was not timely filed, an appellant must have sought leave to file an out-of-time grievance, and if he has not done so before bringing suit, then his administrative remedies will be considered unexhausted, since to find otherwise would allow inmates to simply ignore the PLRA's exhaustion requirement and still gain access to federal court); <u>McDaniel v. Crosby</u>, 194 Fed.Appx. 610, 613 (11 Cir. 2006) (holding that administrative procedures exhausted after a complaint is filed does not suffice to satisfy §1997e(a), and in so ruling, noting: "To the extent McDaniel relies upon the grievances and appeals he submitted after filing his initial complaint, such grievances and appeals cannot be used to support his claim that he exhausted his administrative remedies, because satisfaction of the exhaustion requirement was a precondition to the filing of his suit, and, thus, must have occurred before the suit was filed") (citing <u>Hawk</u>,

supra, 159 F.3d at 1325-26).

Thus, the Courts have held that satisfaction of the PLRA exhaustion requirement serves as a threshold issue, since the statutory mandate requires an inmate/prisoner must have fully exhausted the administrative remedies/processes which are available to him or her, <u>before</u> bringing suit on a claim in federal court, regardless of the form of relief that the administrative process makes available. See Booth, supra 532 U.S. at 736-41; Higginbottom v. Carter, 223 F.3d 1259 (11th Cir. 2000); Miller, supra, 196 F.3d at 1193; Harris v. Garner, 190 F.3d 1279, 1286 (11 Cir. 1999); Harper, supra, 179 F.3d at 1312; Alexander, supra, 159 F.3d at 1325-26.

Here, on the basis that his complaint was prematurely filed, before exhausting his available administrative remedies, plaintiff Bell's own Affidavit (DE#43) and his exhibit attached thereto, serve to defeat the his own complaint on the claim that he was denied the second ankle brace.

It is plain from Bell's complaint and Affidavit that he claims he made medical requests for a replacement ankle brace, and those allegations are presumed to be true for purposes of this Report on defendant Bhadja's motion. Under requirements of the Florida Administrative Code, which embodies the inmate grievance procedure for prisoners in the Florida DOC, however, the plaintiff Bell must also have filed a grievance at the institutional level incorporating his medical claim [here, denial of an ankle brace], and if that grievance was denied, he must thereafter have filed an appeal to the DOC Central Office in Tallahassee, before filing a §1983 suit for damages in federal court.[7]

---

[7] In general, the rules for Florida inmate grievances, as published in the Florida Administrative Code, provide first for an inmate to file an Informal Grievance, see F.A.C. §33-103.005(1), and thereafter, if dissatisfied with the response, to file a formal grievance at the institution, see: F.A.C. §33-103.006, et seq. Thereafter, in the event that the inmate feels the grievance was not satisfactorily resolved during the formal grievance procedure, he may file a Request for Administrative Remedy or Appeal to the Office of the Secretary, see F.A.C. §33-103.007, et seq. See Chandler v. Crosby, 379 F.3d 1278, 1288 (11 Cir. 2004).

In his Affidavit (DE#43) Bell states, as follows:

> 24. For a long period of time I attempted to obtain another leg/ankle brace and the medical shoes which led me to filing grievance regarding the medical care and treatment of my leg/ankle in October 2007. Because of the filed grievance, Dr. Bhadja called me for a personal interview about the matter.

(DE#43, p.3, ¶24). To the Affidavit, Bell attaches a copy of a Response to a Request for Administrative Remedy or Appeal, dated 11/28/07, which Bell relies upon as proof that he exhausted his administrative remedies. The 11/28/07 Response to Bell's appeal reads, as follows, verbatim:

> Appeal Denied.
>
> Your request for administrative remedy was received in this office and it was carefully evaluated. Records available to this office also were reviewed.
>
> It is determined that the response made to you by Dr. Bhadja on 10/17/07 appropriately addresses the issues you presented.

(DE#43, p.4).

In sum, the plaintiff Bell claims that after attempting over a long period of time to convince Dr. Bhadja to provide him with a replacement ankle brace, he finally resorted to filing a grievance against Dr. Bhadja. Bell admits that he filed the grievance in

---

In the case of medical concerns, the Code section relating to the handling of formal grievances (§33-103.006) provides that the inmate may bypass use of an initial informal grievance, and begin his medical complaint with a formal grievance at the institution (see §33-103.006(3)(e). This is known as a formal "Grievance of a Medical Nature" (see §33-103.008). If the inmate is dissatisfied with the result of the medical formal grievance (e.g., if it is denied), the Code provides that (like a non-medical formal grievance), the inmate is authorized to appeal to the Office of the Secretary. (see §33-103.007, supra, "Appeals to the Secretary").

October 2007. (Affidavit, DE#43, p.3, ¶24). He admits that the filing of the October 2007 Grievance against Dr. Bhadja resulted in Dr. Bhadja calling him in for a personal interview to discuss the matter. (Id.). In opposition to the defendant's contention that he had not filed any appeal, Bell filed his Exhibit, the 11/28/07 Appeal Response, to show that he had indeed appealed. (DE#43 at p.4). The appeal response not only confirms Bell's assertion/admission that he filed the underlying grievance, but it establishes that the grievance at the institutional level was denied, and that that denial was on 10/17/07. (Id.). That date [10/17/07] was just three days before the plaintiff Bell signed his complaint in this case on 10/20/07. (See DE#1, p.9). Only after the 10/17/09 denial of Bell's October 2007 grievance, could Bell file his administrative appeal to the DOC Central Office in Tallahassee. The 11/28/07 Response to Bell's Grievance Appeal, denying the appeal, was issued 37 days after Bell signed and filed his complaint in this case. The appeal was not complete until issuance of the Response.

Because Bell proceeded to file his §1983 complaint [incorporating his claim that he was denied a replacement ankle brace] almost immediately after his grievance at the institutional level on that claim was denied [3 days after the 10/17 denial], rather than waiting an additional month to complete his appeal and then file his complaint, the §1983 complaint alleging refusal of the second ankle brace was prematurely filed, and must be dismissed pursuant to 42 U.S.C. §1997e(a).

### IV.  CONCLUSION

For the above stated reasons it is therefore recommended that: 1) the defendant Bhadja's motion for summary judgment (DE#36) be granted; and 2) this case be Closed.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: January, 26<u>th</u>, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

cc:    David J. Bell, Jr., <u>Pro Se</u>
       DC# 182031
       Okeechobee Correctional Institution
       3420 N.E. 168th Street
       Okeechobee, FL 34972-4824

       Jeremy Thomas Palma, Esquire
       RISSMAN, BARRETT, HURT,
            DONAHUE & MCLAIN, P.A.
       201 E. Pine Street, Suite 1500
       P.O. Box 4940
       Orlando, FL 32802-4940